IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| DAVID JACKSON and LOREE JACKSON, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> STATE FARM FIRE AND CASUALTY ) <br> COMPANY, ) <br> ) <br> Defendant. ) | Case No. CIV-24-5-D |

### ORDER

Before the Court is Defendant State Farm Fire and Casualty Company's Motion for Partial Summary Judgment and Brief in Support [Doc. No. 37]. Plaintiffs David and Loree Jackson filed a response [Doc. No. 43], and Defendant filed a reply [Doc. No. 45]. The matter is fully briefed and at issue.

### INTRODUCTION

Plaintiffs' property was damaged by a storm in April of 2023, during the term of Plaintiffs' home insurance policy issued by Defendant. Plaintiffs made a claim against their policy, which Defendant denied in part. Thereafter, Plaintiffs brought this action, asserting claims of breach of contract and bad faith against Defendant. Plaintiffs also seek punitive damages in connection with their bad faith claim. In the present motion, Defendant seeks summary judgment on Plaintiffs' bad faith claim and the availability of punitive damages.

### STANDARD OF DECISION

Summary judgment is proper "if the movant shows that there is no genuine dispute

1

as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In deciding whether summary judgment is proper, courts do not weigh the evidence and determine the truth of the matter asserted, but determine only whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute is genuine if the facts and evidence are such that a reasonable juror could return a verdict for either party. *Id.* In evaluating a motion for summary judgment, a district court must consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences from those facts in favor of that party. *See Sylvia v. Wisler*, 875 F.3d 1307, 1328 (10th Cir. 2017).

## UNDISPUTED MATERIAL FACTS

Plaintiffs' property located at 8900 Legacy Crossing Drive in Oklahoma City, Oklahoma was insured by Defendant, Policy No. 36-B5-X875-5. The policy covered "accidental direct physical loss to the property," with certain exclusions and limitations. The policy was in effect from October 13, 2022, to October 13, 2023. [Def.'s UMF Nos. 1, 5; Pls.' Resp. to UMF Nos. 1, 5].

Plaintiffs claim that on April 19, 2023, the property incurred damage from wind and hail. Plaintiffs reported the loss to Defendant on April 24, 2023. Defendant's claim file reflects that Mrs. Jackson provided the facts of loss, to include "[h]ail damage to the soft

metals, and to the roof shingles. Granular loss." [Def.'s UMF Nos. 6, 7; Pls.' Resp. to UMF Nos. 6, 7; Claim File, Doc. No. 37-3, at 17].[1]

On April 29, 2023, Peter Ross, an adjuster working on behalf of Defendant, called Mrs. Jackson to discuss the loss and schedule an inspection. Mr. Ross inspected the property on May 2, 2023. Also present at the inspection were Plaintiffs and their then-contractor, Patrick Yandell with Maupin Roofing. [Def.'s UMF Nos. 8, 9; Pls.' Resp. to UMF Nos. 8, 9; D. Jackson Depo., Doc. No. 37-4, at 7].

Plaintiffs testified that after about two hours of Mr. Ross inspecting their property, Mr. Ross told them that if the roof did not have impact-resistant shingles, it was "totaled for sure." [L. Jackson Depo., Doc. No. 43-2, at 13-14; D. Jackson Depo., Doc. No. 43-3, at 19; L. Jackson Notes, Doc. No. 43-7, at 2].[2]

Relevant portions of Mr. Ross's inspection results are noted in the claim file as follows:

> INSPECTION RESULTS: …
>
> AccuWeather Report Details:
> - Hail Size 1.25 to 2 in
> - Sustained wind speed less than or equal to 50 mph …

---

[1] Throughout this Order, the Court uses the ECF header pagination when referring to documents filed in this case.

[2] In its motion, Defendant refers to a Roofing Installation Information and Certification for Reduction in Residential Insurance Premiums [Doc. No. 37-2]. This form was included in the documents by which Plaintiffs first obtained coverage from Defendant in 2016. The form was purportedly signed by a roofing contractor, Benjamin Burk, and it certifies that Plaintiffs' roof had impact-resistant shingles, entitling them to a discount on their insurance premiums. However, Mr. Burk denies signing this form, and instead alleges that he told Plaintiffs' insurance agent that the shingles were not impact-resistant. [B. Burk Aff., Doc. No. 43-1, at 1-2]. The Court finds that this disputed fact is immaterial. In its reply, Defendant clarifies that—by referencing the certificate entitling Plaintiffs to lower premiums—Defendant does not intend to avoid the insurance policy as issued or recalculate higher premiums. [Doc. No. 45, at 5-6].

> Soft Metals: Hail damage to the shop metal roof and the soft metals on the house and elevations direction of the storm. Spatter present is large.
>
> Coverage A – Narrative: A 1.75" hail storm coming from the SE primarily damaged the shop metal roof and the house shingle roof on 3 directional slopes. Roof warrant a [total roof replacement]. Collateral damage to the gutters, some downspouts and stain on wood furniture.
>
> Dwelling - Roof: Inspected a 16 year old laminate roof and found hail damage to the shingles on 3 directional slopes and the soft metals, a [total roof replacement] is warranted as damages exceed 50% of roof surface. …
>
> Settlement: Explained to the [Named Insureds] and [Contractor] Patrick that damages are consistent with Hail activity and that a [State Farm estimate] will be completed and explained in a phone conversation.

[Claim File, Doc. No. 37-3, at 15-16].

Defendant describes Mr. Ross's inspection results as an "initial assessment." If Mr. Ross's initial assessment had been utilized as Defendant's final decision, the result would have been a full replacement of the home's roof. [Def.'s UMF No. 11]. Following his inspection, Mr. Ross prepared a draft estimate for a total roof replacement, with a replacement cost value of $54,143.73. [Doc. No. 37-6, at 2].

Upon reviewing Mr. Ross's inspection findings, Mr. Ross's supervisor, Manuel Crispin, noted that "some of the photos show[] foot fall and [are] not consistent with hail," and "[o]ne of the photos shows algae and does not appear to be hail impact marks." [Doc. No. 37-3, at 12]. Mr. Crispin also noted that test squares needed to be drawn and

4

photographed.[3] *Id.* Mr. Ross was directed to go back to the property and "schedule with the firm trainer to assist." *Id.* Although Defendant acknowledges that Mr. Ross was not a "novice" or "trainee" at the time of the first inspection, Defendant asserts that it provides ongoing training to adjusters of all levels. [Pls.' AUMF No. 4; Def.'s Resp. to AUMF No. 4].

A second inspection was scheduled for May 7, 2023. [Def.'s UMF No. 15; Pls.' Resp. to Def.'s UMF No. 15; Claim File, Doc. No. 37-3, at 11 ("Called [Mrs. Jackson] to explain that … an additional supervisor would be coming to next inspection to verify damages.")].

On May 7, 2023, Mr. Ross returned to the property with a trainer, Jonathan Huie. Much of what occurred at this second inspection/training exercise is disputed. Mrs. Jackson testified that Mr. Ross and Mr. Huie did not get on the roof together and that they spent less than thirty minutes at the property. [L. Jackson Depo., Doc. No. 43-2, at 16]. Mr. Jackson does not remember Mr. Ross ever getting on the roof during the second inspection. [D. Jackson Depo., Doc. No. 43-3, at 22 ("Peter Ross never got up there with [Mr. Huie] which we thought was odd because [Mr. Huie] was there to train [Mr. Ross] but he never did get up there on the roof with him.")]. No test squares were drawn during the second inspection. [P. Ross. Decl., Doc. No. 37-7, at 3]. Plaintiffs allege that only two slopes of the home were inspected during the second inspection, and Mr. Ross's declaration provides

---

[3] At his deposition, Mr. Ross testified that he did not feel the need to complete test squares during the first inspection because "[he] felt confident that the storm had damaged everything on that property, with the exception of one slope[.]" [P. Ross Depo., Doc. No. 43-5, at 30].

that "[d]uring the second inspection on May 7, 2023, Mr. Huie and I both inspected and photographed the front and right slopes of the home." *Id.* at 2. If only the front and right slopes were inspected, then the second inspection did not cover two roof slopes where Mr. Ross had initially found enough damage to recommend a total roof replacement. [Pls. Resp. to Def.'s UMF No. 12].

Following the second inspection, Mr. Ross again uploaded his inspection results to the claim file, but this time Mr. Ross reported that he "found no visible hail damage to the shingles on all directional slopes" and noted hail damage only to the soft metals.[4] [Doc. No. 37-3, at 10]. At her deposition, Mrs. Jackson testified that when Mr. Ross called Plaintiffs about the results of the second inspection, Mr. Ross told them that "the trainer's inspection overruled [his]." [L. Jackson Depo., Doc. No. 43-2, at 18; L. Jackson Notes, Doc. No. 43-7, at 3].

On May 17, 2023, Defendant sent a denial letter to Plaintiff, providing in part:

> Based upon the results of our discussion, site inspection and investigation, it was determined there was no accidental direct physical loss to the shingles on all the slopes of the house roof and to the siding on all the elevations of the house. Our inspection discovered damages resulting from wear and tear or age and deterioration. Damage from these perils is excluded by your policy.

[Doc. No. 43-9, at 1]. After deducting $7,102.63 in withheld depreciation and $4,131.00 for Plaintiffs' deductible, Defendant remitted payment in the amount of $11,191.83 for the

---

[4] After the second inspection, a shingle from Plaintiffs' roof was tested, and it was determined that the shingles were not impact-resistant. [Def.'s UMF No. 24; Pls.' Resp. to Def.'s UMF No. 24].

dwelling coverage.[5] [Def.'s UMF No. 30].

On June 26, 2023, a public adjuster working on behalf of Plaintiffs e-mailed Defendant, requesting a third inspection and a copy of Plaintiffs' insurance policy. [Doc. No. 37-20, at 1]. On July 12, 2023, the public adjuster sent Defendant an estimate for a total roof replacement in the amount of $82,245.22, along with additional photographs of the purported hail damage. [Doc. No. 37-21]. Defendant's hail reconciliation unit responded that "the photos provided do not support your request for a total roof replacement. The roof has been inspected twice, there will be no revisions at this time." [Doc. No. 37-22].

On August 15 and September 8, 2023, contractor Benjamin Burk contacted Defendant on behalf of Plaintiffs. [Doc. Nos. 37-24, 37-25]. Mr. Burk provided additional photographs to Defendant, noted that "all roofs neighboring [had] been fully totaled and replaced by State Farm and other companies," and provided an estimate for a total roof replacement in the amount of $55,617.58. [Doc. No. 37-25, at 1; Doc. No. 37-26, at 2-3]. However, Defendant maintained that a total roof replacement was not warranted. [Doc. No. 37-3, at 2].

## DISCUSSION

### I.   Bad Faith

Under Oklahoma law, an insurer has an implied duty to deal fairly and act in good faith toward its insured, and the violation of that duty gives rise to an action in tort.

---

[5] This amount does not include payments related to the separate metal shop building.

*Christian v. Am. Home Assurance Co.*, 577 P.2d 899, 904 (Okla. 1977); *see also Badillo v. Mid Century Ins. Co.*, 121 P.3d 1080, 1093 (Okla. 2005) (recognizing an "implied-in-law duty to act in good faith and deal fairly with the insured to ensure that the policy benefits are received."). "[A]n insurer's right to resist payment or resort to a judicial forum to resolve a legitimate dispute" is well-established. *Gov't Emps. Ins. Co. v. Quine*, 264 P.3d 1245, 1249 (Okla. 2011); *see also Ball v. Wilshire Ins. Co.*, 221 P.3d 717, 725 (Okla. 2009); *Brown v. Patel*, 157 P.3d 117, 126-27 (Okla. 2007). "However, when presented with a claim by its insured, an insurer 'must conduct an investigation reasonably appropriate under the circumstances' and 'the claim must be paid promptly unless the insurer has a reasonable belief that the claim is legally or factually insufficient.'" *Newport v. USAA*, 11 P.3d 190, 195 (Okla. 2000) (citation omitted). An insurer's duty "to *timely* and *properly* investigate an insurance claim is intrinsic to an insurer's contractual duty to *timely* pay a valid claim." *Brown*, 157 P.3d at 122 (emphasis in original).

Upon consideration of the summary judgment record, viewed in the light most favorable to Plaintiffs as the non-moving parties, the Court finds that genuine disputes of material fact preclude summary judgment on the issue of bad faith. Plaintiffs have presented sufficient facts from which reasonable jurors could conclude that Defendant did not conduct a reasonable investigation of Plaintiffs' claim. Mr. Ross conducted a thorough first inspection of Plaintiffs' property and found that a "[total roof replacement] [was] warranted as damages exceed 50% of roof surface." [Doc. No. 37-3, at 15-16]. At his deposition, he testified that he physically touched the places he believed to be consistent with hail damage, and that "[he] thought [he] was feeling hail strikes on the roof." [P. Ross

Depo., Doc. No. 43-5, at 27]. Plaintiffs testified that on the day of the first inspection, Mr. Ross told them that there was "certainly" hail damage and, if the shingles were not impact-resistant, the roof was "totaled for sure." [L. Jackson Depo., Doc. No. 43-2, at 13-14; D. Jackson Depo., Doc. No. 43-3, at 19-20].

Based on his inspection, Mr. Ross submitted an estimate for a total roof replacement. Mr. Crispin reviewed the photos and directed Mr. Ross to conduct a second inspection with a trainer. The claim file reflects Mr. Crispin's directive for Mr. Ross to "please go back out to the [property] and take the correct photos to support [total roof replacement]" and conduct test squares. [Doc. No. 37-3, at 12].

At the second inspection, Plaintiffs testified that only Mr. Huie got on the roof and that the second inspection lasted less than thirty minutes. No test squares were drawn at the second inspection, and Plaintiffs allege that Mr. Huie inspected only two of the slopes. Following the second inspection, Mr. Ross re-submitted his inspection results. His findings were revised from "found hail damage to the shingles on 3 directional slopes," warranting a total roof replacement, to "found no visible hail damage to the shingles on all directional slopes." [Doc. No. 37-3, at 10, 15-16]. Plaintiffs have testified that this reversal was not explained to them, other than Mr. Ross stating that he was overruled by the trainer. Thereafter, Defendant denied Plaintiffs' request for a third inspection. Upon careful consideration of the record, viewed in the light most favorable to Plaintiffs, a reasonable juror could conclude that Defendant's investigation was outcome-determinative, or that the second inspection was scheduled solely to overrule a trained adjuster's assessment that a total roof replacement was warranted.

Because the Court finds that the reasonableness of Defendant's conduct to ensure that Plaintiffs received the benefits of their home insurance policy is reasonably subject to different conclusions, Defendant is not entitled to summary judgment. *See McCorkle v. Great Atl. Ins. Co.*, 637 P.2d 583, 587 (Okla. 1981) ("[I]f there is conflicting evidence from which different inferences may be drawn regarding the reasonableness of [an] insurer's conduct, then what is reasonable is always a question to be determined by the trier of fact by a consideration of the circumstances in each case."). Accordingly, Defendant's motion for summary judgment is denied as to Plaintiffs' bad faith claim.

## II.  Punitive Damages

Defendant also seeks summary judgment on Plaintiffs' request for punitive damages. For punitive damages, "there must be evidence, at a minimum, of reckless disregard toward another's rights from which malice and evil intent may be inferred." *See Badillo*, 121 P.3d at 1106. Based on the summary judgment record, the Court finds that a summary adjudication on punitive damages would be premature, and the Court will instead rule on whether punitive damages will be submitted to the jury based on the evidence offered at trial and with the benefit of a complete trial record. *See Anders v. Walmart Inc.*, Case No. CIV-21-159-F, 2021 WL 6135568, at *2 (W.D. Okla. Dec. 29, 2021) (internal citation omitted) ("While the court concurs with defendant that the issue of punitive damages may be properly decided at the summary judgment stage, the court opines that the recoverability of punitive damages in this action is best resolved at trial with the benefit of a complete record."); *see also Cadena v. Rock Ridge Ins. Co.*, Case No. CIV-24-715-R, 2025 WL 1426565, at *6 (W.D. Okla. May 16, 2025).

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant's Motion for Partial Summary Judgment and Brief in Support [Doc. No. 37] is **DENIED**. The parties shall propose deadlines for the remaining scheduling order deadlines within 10 days of this Order.

**IT IS SO ORDERED** this 17th day of September, 2025.

TIMOTHY D. DeGIUSTI
Chief United States District Judge